2018 IL App (2d) 170714
No. 2-17-0714
Opinion filed November 30, 2018

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| CRYSTAL LAKE LIMITED PARTNERSHIP, | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 10-LA-183 |
| | ) | |
| BAIRD & WARNER RESIDENTIAL SALES, | ) | |
| INC., | ) | Honorable |
| | ) | Michael T. Caldwell, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices McLaren and Hutchinson concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, Crystal Lake Limited Partnership (CLLP)—the landlord—sued defendant, Baird & Warner Residential Sales, Inc. (B&W)—the tenant—for breach of certain commercial leases. B&W had for many years leased premises (the premises) in the Crystal Lake Plaza shopping center (the shopping center), in Crystal Lake, Illinois. CLLP alleged that B&W breached a covenant to restore the premises to their original configuration at the end of the lease terms and that such failure to restore, *inter alia*, also constituted a holdover under the leases. A jury found in CLLP's favor on two counts of its amended complaint, but the trial court subsequently granted B&W judgment notwithstanding the verdict (JNOV) on the holdover claim and ordered a new trial on damages for breach of the covenant to restore. Thereafter, B&W

consented to the entry of judgment against it on the failure-to-restore count. CLLP appeals the JNOV relating to the holdover count. CLLP also appeals an order awarding it less than the total amount of attorney fees that it requested and orders denying its motions for prejudgment interest and sanctions. We affirm in part, reverse in part, vacate in part, and remand for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3      CLLP owns the shopping center, located at Route 14 and Keith Avenue in Crystal Lake. Madison Corporate Group (Madison) manages the shopping center. Thomas Eilers Sr. (Tom Sr.) and Thomas Eilers Jr. (Tom Jr.) were the Madison principals who dealt with B&W throughout the events leading up to the litigation. B&W is the oldest real estate brokerage firm in the Midwest, with offices in Chicago and throughout the suburbs. Tom Sr. had worked for B&W as a young man and had a prized personal relationship with the Baird family.

¶ 4      In 1988, B&W desired to move its office from an in-line space in the shopping center to a new "outlot" building fronting Route 14. The outlot building would afford more space and more public visibility. According to an existing floor plan (the original floor plan), the outlot building was divided into four rectangular spaces, designated as "A," "B," "C," and "D," with different dimensions. Each space had its own bathroom and utilities and was separately metered. At trial, Tom Sr. testified that he let a space in the outlot building to B&W because of his relationship with the Baird family. Evidence showed that spaces in the outlot building were more valuable to the shopping center if they were occupied by retail establishments rather than business offices.

¶ 5                       A. The 1988 Lease and Amendments

¶ 6      On February 19, 1988, the parties entered into a five-year written lease for space "A," which was approximately 2465 square feet. According to the original floor plan, attached to the

lease as an exhibit, space "D" was above space "A," and spaces "C" and "B" were to the left of space "A."

¶ 7     Paragraph 15 of the lease, titled "Surrender of Premises," provided in pertinent part that, upon the termination of the lease, the tenant would surrender the premises to the landlord "in good order, condition, and repair," except for ordinary wear and tear. That paragraph also provided that the tenant "shall remove all trade fixtures and other property." Paragraph 16 of the lease, titled "Holding Over," provided in pertinent part that, "[i]f Tenant holds possession of the Leased Premises after the termination of this Lease, whether by lapse of time or otherwise," the tenant would pay additional rent and other costs as liquidated damages. Paragraph 19, titled "Alterations and Additions," provided in pertinent part that, if the tenant had made any alterations or additions during the lease term, upon written notification by the landlord, the tenant shall restore the premises to the condition they were in before the lease commenced.

¶ 8     On June 28, 1993, the parties entered into the "First Amendment to Lease." In pertinent part, that amendment added approximately 786 square feet, designated as space "F," which was directly above space "A" and was the space formerly designated as space "C." On February 3, 1999, the parties entered into the "Second Amendment to Lease," which, in pertinent part, extended the lease of spaces "A" and "F" until May 31, 2004.

¶ 9                              B. The 1999 Lease

¶ 10    Also on February 3, 1999, the parties entered into a separate lease for the spaces then designated as "C" and "D," containing approximately 1977 square feet. Those areas had been designated as space "B" in the 1988 lease. The February 3, 1999, lease contained the same "Surrender of Premises," "Holding Over," and "Alterations and Additions" provisions as the 1988 lease. The original floor plan was attached to and incorporated into the 1999 lease.

¶ 11                                    C. The 2004 Leases

¶ 12    On April 19, 2004, the parties entered into two separate leases, one for the spaces designated as "A," "B," and "D," consisting of 5228 square feet, and the second for space "C," containing approximately 1287 square feet. The parties treated the first lease as an extension of the prior leases. Again, the original floor plan was attached to and incorporated into the 2004 leases.

¶ 13    Under these combined leases, B&W was now renting the entire outlot building. The 2004 leases ended on May 31, 2009. Both leases contained the same "Surrender of Premises," "Holding Over," and "Alterations and Additions" provisions as the 1988 and 1999 leases. Over the years, to suit its needs and aesthetic requirements, B&W added square footage, demolished demising walls, furnished the interior of the premises, and placed exterior signage on the building. According to Tom Sr., for liability reasons, CLLP did not keep a set of keys to the premises.

¶ 14                                    D. The Dispute

¶ 15    In 2008, the Great Recession caused B&W to close offices throughout the suburbs and to lay off employees. B&W asked CLLP for a rent reduction or a smaller, in-line space. When the parties did not reach an agreement, B&W notified CLLP of its intention to leave the shopping center at the end of its leases. CLLP then invoked the "Alterations and Additions" provisions of the leases. CLLP demanded that B&W restore the premises to their prealteration, 1988 condition: four individual units, each with a separate bathroom and utilities and separately metered. When B&W ignored that demand and then vacated the premises as of May 31, 2009, CLLP, on June 3, 2009, invoked the "Holding Over" provisions of the leases and demanded a

year's additional rent. CLLP also advertised the premises in the 2009 spring and fall editions of the Metro-Chicago Retail Space Guide.

¶ 16    There ensued almost a year during which the outlot building remained vacant while CLLP negotiated with B&W to restore the premises. CLLP had obtained a quote to do the restoration for approximately $100,000, but, upon learning of that quote, B&W obtained its own estimate to do the work for less and represented that it would do it. For instance, on June 19, 2009, Warren Habib, B&W's CFO, told Tom Jr. that "I am happy to work with you as it is reasonable. We got our own estimate and it would be substantially lower than what your contractor will charge you." Tom Jr. replied: "Your lower cost estimate *** is very good news." Tom Jr. asked Habib to send him the estimate and then stated that CLLP would need to approve any architectural drawings. When the parties still had not come to terms by mid-July 2009, Habib notified Tom Jr. that Steven Baird, B&W's CEO, "will be in touch with your dad to see if a reasonable solution can be worked out." The talks between Tom Sr. and Baird were not productive. On April 6, 2010, Habib offered Tom Jr. $25,000 in cash, "or we will do the work." CLLP rejected the offer of $25,000. However, B&W never commenced the work, nor did CLLP have the work done. Then, on April 23, 2010, Julie Ann's Frozen Custard (Julie Ann's) signed a lease for part of space "B" and built it out to its own specifications. In 2012, Check 'n Go also leased a part of space "B," along with a small portion of space "A."

¶ 17                                    E. The Lawsuit

¶ 18    On November 3, 2011, CLLP filed its amended complaint for breach of contract against B&W. Counts I, II, and III were brought in the alternative and alleged B&W's failure to restore the premises under the various leases. Count IV alleged that B&W's breaches, including its failure to restore the premises, return the keys, and remove the signage, constituted a holdover

under the leases. Count V was brought in the alternative to count IV, alleging that B&W willfully deprived CLLP of access to the premises and seeking relief pursuant to section 9-202 of the Code of Civil Procedure (Code) (735 ILCS 5/9-202 (West 2010) (providing that a person who willfully holds over after the expiration of a lease term shall pay the landlord double the yearly rent)). Essentially, CLLP contended that the 2004 leases were an extension of all the prior leases. B&W denied the allegations and filed numerous affirmative defenses. Pertinently, B&W contended that CLLP violated the implied covenant of good faith and fair dealing and that a novation extinguished the 1988 and 1999 leases, leaving only the 2004 leases for the jury's consideration. Thus, B&W contended that it had no obligation to restore the premises to their 1988 condition. B&W also alleged that CLLP failed to mitigate its damages. Prior to trial, the court determined that, for breach of the covenant to restore, the measure of damages was the cost of repair.

¶ 19                                  F. The Trial[1]

¶ 20                          1. CLLP's Case-in-Chief

¶ 21    In addition to the above, the record establishes the following. On February 2, 2004, B&W sent CLLP an e-mail asking for a proposal to extend its "current lease" and to "lease the additional square footage as well." The "additional square footage" referred to space "C," which was then occupied by a beauty shop. The parties came to terms that resulted in the two 2004 leases that expired on May 31, 2009, as noted above.

¶ 22    In October 2008, Michael Gallo, B&W's real estate broker, proposed to Tom Jr. that, upon the expiration of the leases the next May, B&W move into a smaller, in-line space and pay less rent or remain in the outlot building but occupy less square footage at reduced rent. Gallo

---

[1] Prior to the trial, the court denied cross-motions for summary judgment.

also proposed that CLLP give B&W a tenant improvement allowance and pay Gallo a 4% brokerage fee. Tom Jr. replied with a counterproposal but denied Gallo's request for a brokerage fee. The parties could not reach an agreement, so on January 7, 2009, B&W gave CLLP notice that it would not renew its leases.

¶ 23    On February 4, 2009, Tom Jr. notified Habib by e-mail that CLLP had the option under paragraph 19 of the leases (going back to the 1988 lease and the amendments) to require that B&W restore the premises to their 1988 condition, "as they were before" B&W made any alterations or additions. Tom Jr. spelled out that this meant returning the outlot building to its four-unit configuration as shown on the original floor plan, which Tom Jr. attached to his e-mail. Tom Jr. invited Habib to meet to discuss "these outstanding matters." Habib did not respond. On February 9, 2009, Tom Jr. sent Habib another e-mail, suggesting that they discuss the February 4 e-mail, which Tom Jr. included. On February 11, 2009, at 11:12 a.m., Habib stated in an e-mail to Tom Jr., "I don't see many issues left ***. The fixtures will remain and we will do a final cleaning upon our departure."

¶ 24    On February 11, 2009, at 2:13 p.m., Tom Jr. wrote to Habib: "We have discussed the situation with our partners and feel that, in this market, we would like the space returned to us in the condition it was given to [B&W]. This would be the 4 individual units each with bathrooms, separate utilities, and the spaces metered. I have attached another copy of the [original floor plan]." Habib did not respond, although he sent the e-mail chain to Gallo with the question, "Have you ever heard of this?"

¶ 25    On March 23, 2009, Tom Jr. formally invoked paragraph 19 of the leases (again, going back to the 1988 lease and the amendments): "Pursuant to the [leases], the Tenant shall, at or before the expiration of the Lease Term (May 31, 2009), remove any alterations and additions

and restore the Leased Premises, at Tenant's sole cost and expense, as they were before such alterations and additions were made by Tenant." Tom Jr. again attached the original floor plan and asked Habib to call him "to discuss the scheduling of this work." When Habib did not respond, Tom Jr. sent him a letter by certified mail on March 31, 2009, giving B&W "official notice" of its "responsibilities." Tom Jr. again invoked the covenant to restore the premises and again attached the original floor plan.

¶ 26   On April 8, 2009, Gallo informed Habib that restoration of the premises was addressed in the leases, but he added: "[P]erhaps it should be left as a legal issue."

¶ 27   On May 8, 2009, having heard nothing from Habib, Tom Jr. sent him an e-mail reminding him of B&W's responsibility to restore the premises and telling him that CLLP had obtained pricing of $101,667 for the work. Tom Jr. asked Habib to call him to discuss the restoration. Habib did not communicate with CLLP, under instruction from Baird, who admonished Habib to "ignore" Tom Jr. Then, on May 29, 2009, Tom Sr., who was unaware of Baird's "ignore him" directive, wrote to Baird, reminding him of Tom Sr.'s relationship with Baird's father and that CLLP had allowed B&W to move into the outlot building solely because of Tom Sr.'s appreciation of the role that B&W had played in advancing his career. Tom Sr. wished Baird the "best to you and your family," and he expressed regret that Baird and his wife did not drink coffee and so would not meet Tom Sr. and his wife over a cup. After receiving Tom Sr.'s letter, Baird told Habib, "I still think we should do nothing."

¶ 28   B&W's employees left the premises on or before May 31, 2009. B&W left behind its fixtures and signage and did not return its keys to CLLP when it vacated the premises. B&W returned the keys on June 22, 2009, and it removed its signs in August 2009.

2018 IL App (2d) 170714

¶ 29    On June 3, 2009, Tom Jr. sent Habib another certified letter in which he reminded B&W of the covenant to restore the premises and stated: "As of June 3, 2009, Tenant has not restored the Leased Premises and is now a holdover tenant." CLLP demanded another year's rent plus passthrough charges for the common areas, taxes, and insurance. At trial, Tom Sr. testified that "what we really wanted was for [B&W] to *** have a dialogue about [restoring the premises], *** and they [*sic*] never did. So we had to exercise [our] rights under the lease." Tom Sr. also testified that, in his opinion, B&W's obligation to restore the premises meant that it had to be in possession to do that.

¶ 30    The next day, June 4, 2009, Habib asked Tom Jr. for CLLP's quote to restore the premises. Then, B&W contacted its own contractor and asked him to quote the work as cheaply as possible. Tom Jr. testified that B&W's quote was not acceptable to CLLP, as it proposed to "close off a couple of openings and build one bathroom," as opposed to restoring the four units. According to Tom Jr., over roughly the next year, Habib kept promising to restore the premises but at the same time was arguing that they should not be restored until a new lessee was found. Tom Jr. testified that CLLP held off restoring the premises itself, based on Habib's representations that B&W would do it. Tom Jr. also testified that CLLP was demanding less than a complete restoration by requesting that B&W construct four code-compliant "vanilla boxes."

¶ 31    Robert Arendt, B&W's contractor, testified that a "vanilla box" means a space that has four white walls, a white ceiling, bare floors, and basic lighting, with its own bathroom. According to Arendt, in June 2010, B&W authorized him to obtain a city permit to proceed with the construction, but on his way to city hall he passed by the outlot building and observed construction in progress. Arendt testified that he ascertained that a yogurt shop was preparing to occupy the premises. B&W then instructed Arendt to do nothing further.

¶ 32    Both Tom Jr. and Tom Sr. testified that CLLP lost revenue as a result of B&W's failure to restore the premises before the termination of the leases. Real estate appraiser Michael MaRous testified that the value of the premises configured as four spaces was greater than its value configured as one space. With respect to the holdover claim, CLLP asked the jury for a year's combined rent under both 2004 leases plus passthrough charges for the common areas, taxes, and insurance, in the total amount of $227,720.

¶ 33    After the court denied B&W's motion for a directed verdict, B&W presented its case to the jury.

¶ 34                              2. B&W's Case-in-Chief

¶ 35    Arendt and Soraya Gallego, B&W's space planner, both testified that the original floor plan was sufficiently detailed to allow them to understand what was required to restore the premises.

¶ 36    Habib and Baird testified that they were not familiar with the restoration covenant in the leases. Baird testified that he had never heard of such a thing. Baird and Habib both testified that no one knew what the condition of the premises was in 1988 and, further, that CLLP's demand was to build the premises to current code. Baird testified that he was shocked when CLLP declared B&W a holdover tenant. According to Baird, B&W had timely vacated the premises and left them in broom-clean condition, as it had done with other leased premises. Baird acknowledged that B&W left its fixtures and signage, but he believed that this was how commercial leases were handled. He testified that he did not know that CLLP did not have a set of keys. Baird testified that the B&W Crystal Lake office employed approximately 40 brokers, each of whom had a key. He assumed that CLLP would simply change the locks. According to Baird, he was going through such a difficult time with the Great Recession's impact on his

business that he decided to deal with CLLP's demands after B&W completed its move to a new location.

¶ 37    At the close of the evidence, B&W renewed its motion for a directed verdict, which the court denied.

¶ 38                                3. Jury Instructions

¶ 39    Pertinent to this appeal, the court instructed the jury, over B&W's objection, that "a holdover tenant is one who fails to surrender possession to the landlord of the leased premises at the time and in the condition agreed on in the lease." The court further instructed the jury that "possession is the fact of having or holding property in one's power or the exercise of dominion over property. Actual possession or occupancy is not necessary to constitute retention of possession. Possession may be inferred from surrounding facts and circumstances."

¶ 40                                4. The Jury's Verdicts

¶ 41    The jury returned a verdict in favor of CLLP on its claim for breach of contract based on B&W's failure to restore the premises, and it assessed damages in the amount of $111,070.36. The jury also found in favor of CLLP on its claim for breach of contract based on holdover, and it assessed damages in the amount of $113,860. The jury found in B&W's favor on CLLP's holdover claim under section 9-202 of the Code. In addition, the jury answered special interrogatories consistently with its verdicts. Specifically, the jury found that B&W failed to prove any affirmative defenses. The trial court then entered judgment in CLLP's favor and against B&W in the amount of $224,930.36.

¶ 42                                G. Posttrial Motions and the JNOV

¶ 43    CLLP filed a petition for attorney fees and costs pursuant to a fee-shifting provision in the leases and also sought prejudgment interest pursuant to the leases. B&W filed a motion for a

JNOV or alternatively for a new trial. With respect to the holdover verdict, B&W argued that CLLP failed to prove that B&W held over possession or exercised dominion and control over the premises after May 31, 2009, and that the jury was improperly instructed that the failure to return the premises in the condition agreed upon in the leases constituted a holdover. With respect to the failure-to-restore verdict, B&W argued that CLLP failed to prove any actual damages and that the court allowed the jury to apply the wrong measure of damages.

¶ 44 On October 30, 2014, the court ruled on B&W's posttrial motion in a written memorandum. With respect to the holdover verdict, the court found that the evidence showed unequivocally that both parties behaved inconsistently with a finding that B&W possessed the premises after May 31, 2009. Specifically, the court found that B&W "showed absolutely no interest or intent" to return to the premises. The court also noted that CLLP marketed the premises for rent and then rented two smaller spaces within the premises to two tenants and built those spaces to the tenants' specifications without notifying B&W that its holdover tenancy was being modified or forfeited. The court further noted that Arendt "bumped into" CLLP's workers, who were remodeling the premises for Julie Ann's. Consequently, the court ruled, "there was no basis for the jury to conclude that a holdover tenancy was created." The court held that the verdict was "clearly against the manifest weight of the evidence and therefore cannot stand." With respect to the failure-to-restore verdict, the court found that the proper measure of damages was diminution of value, not the cost of repair, and ordered a new trial on damages only.

¶ 45 On November 20, 2014, at B&W's request, the trial court made conditional rulings pursuant to section 2-1202(f) of the Code (735 ILCS 5/2-1202(f) (West 2014)), which requires the court to rule on all relief sought in posttrial motions. Specifically, section 2-1202(f) provides that, if the court's rulings make it unnecessary to rule on other relief requested, the court shall

rule conditionally on those other matters so that its conditional rulings will take effect if the unconditional rulings are later reversed or vacated. Accordingly, the trial court conditionally ruled that B&W was entitled to a new trial on the holdover claim.

¶ 46 On January 2, 2015, the court again, at B&W's request, addressed the proper measure of damages on the failure-to-restore claim and this time held that the measure of damages on retrial would be the lesser of the cost of repair or the diminution in value of the premises. Then, on April 26, 2017, the court corrected its November 20, 2014, order to reflect that it granted the JNOV on the holdover claim because all of the evidence, when viewed in the light most favorable to CLLP, so overwhelmingly favored B&W that no contrary verdict could stand.[2]

¶ 47 The court continued to a later date CLLP's attorney-fee petition and motion for prejudgment interest.

¶ 48 H. B&W's Motion for Judgment Against It

¶ 49 Following the court's grant of a new trial on damages for B&W's breach of the covenant to restore, B&W named new experts and the parties engaged in discovery. Then, on November 18, 2016, B&W moved to enter judgment against it and in CLLP's favor in the amounts of $111,070.36 for breach of the covenant to restore (the same as the jury's award) and $43,927.39 for the three months' lost rent that CLLP would suffer while restoring the premises. That figure was based on CLLP's expert's opinion. B&W represented that this unusual move was dictated by business judgment inasmuch as it would spend more retrying the case. The court granted the motion over CLLP's objection to the amount of lost rent and entered judgment against B&W accordingly.

---

[2] This replaced the manifest-weight-of-the-evidence standard that the court initially employed in granting the JNOV.

¶ 50                              I. CLLP's Motion for Sanctions

¶ 51    On February 14, 2017, CLLP filed a motion for sanctions against B&W and David Shapiro, its attorney, pursuant to Illinois Supreme Court Rule 137 (eff. July 1, 2013), which provides that a signature on a document constitutes a certification that the attorney or party signing the document has made reasonable inquiry into the facts alleged therein. CLLP alleged that B&W's motion for a JNOV violated Rule 137 because B&W's claim that its failure to restore the premises caused no diminution in value was "objectively unreasonable." CLLP argued that, after two years of litigation following the grant of a new trial on damages, the case "ended in the exact same place," with a judgment in CLLP's favor. CLLP requested an award of all of its attorney fees and costs incurred after October 30, 2014.[3] The court denied the motion, noting that CLLP "misled" it into erroneously instructing the jury that the cost of repair was the measure of damages.

¶ 52              J. CLLP's Attorney Fee Petition and Motion for Prejudgment Interest

¶ 53    CLLP sought reimbursement from B&W for its attorney fees of over $500,000, pursuant to paragraph 33 of the leases, which provided that "[t]enant covenants and agrees to pay on demand Landlord's costs and expenses, including but not limited to [attorney] fees and court costs, incurred in enforcing any obligation of Tenant under this Lease." The court awarded CLLP $70,000, explaining that it was a "firm believer" that the amount of fees be proportionate to the amount recovered. The court also expressed its belief that "there is a prevailing party provision" in every fee provision, especially in "unilateral one way" provisions, "which would otherwise have no conditions or limitations whatsoever."

---

[3] CLLP noted that these fees and costs would then be excepted from its petition for fees and costs filed pursuant to the fee-shifting clause in the leases.

¶ 54     With respect to prejudgment interest, paragraph 19 of the leases, dealing with breach of the covenant to restore the premises, provided that the tenant shall reimburse the landlord for the cost of restoring the premises, with "interest thereon at the rate herein provided from the date of commencement of said work until paid." The rate provided in the leases was 10%. CLLP sought such interest on the $111,070.36 judgment from June 1, 2009 (the date the purported holdover tenancy commenced), to December 6, 2016 (the date the judgment was entered). CLLP also sought 10% interest on the sum of $43,927.39 (three months' lost rent) from September 1, 2009 (the end of the three-month period), until December 6, 2016 (the date the judgment was entered). CLLP requested total interest in the sum of $116,442.19. The trial court found that prejudgment interest was not owed, because the amount due to CLLP from B&W on the December 6, 2016, judgment was not "liquidated until [B&W] came in and paid" the judgment. With that, all matters were finally concluded, and CLLP filed a timely notice of appeal.

¶ 55                                        II. ANALYSIS

¶ 56     CLLP first contends that the trial court erred in granting the JNOV on its holdover claim. CLLP argues that the court used the wrong legal standard in ruling on the motion for a JNOV and that there was sufficient evidence to sustain the jury's verdict. B&W asserts that neither the language of the leases nor applicable Illinois law supports CLLP's theory that the failure to restore the premises constituted a holdover. Further, B&W claims that the court employed the correct legal standard in deciding the issue.

¶ 57               A. Standard for Determining Whether a JNOV Should Be Granted

¶ 58     In granting the JNOV, the trial court found that the jury's verdict was against the manifest weight of the evidence. Then, in a revised order, the court struck the manifest-weight language and substituted the following: "The verdict of the jury was *based upon evidence that so*

*overwhelmingly favored the defendant that any verdict to the contrary cannot possibly stand.*"
(Emphasis in original.) In so doing, the court orally acknowledged that it had intended to apply
the JNOV standard in the original order but mistakenly announced the manifest-weight standard.
The original order was interlocutory and could be corrected. See *Leopold v. Levin*, 45 Ill. 2d 434,
446 (1970) (interlocutory order may be modified at any time before final judgment).

¶ 59    A JNOV should be entered only when all of the evidence, viewed in the light most
favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict could
stand based on the evidence. *Northern Trust Co. v. University of Chicago Hospitals & Clinics*,
355 Ill. App. 3d 230, 241 (2004). We review *de novo* a decision on a motion for a JNOV.
*Northern Trust*, 355 Ill. App. 3d at 241.

¶ 60    A court cannot enter a JNOV if there is *any* evidence, together with reasonable inferences
to be drawn therefrom, demonstrating a factual dispute, or if the credibility of the witnesses or
the resolution of conflicting evidence is decisive to the outcome. *Northern Trust*, 355 Ill. App. 3d
at 242-43. Here, the trial court was aware of the correct standard, as it found that all of the facts
favored B&W. Accordingly, we reject CLLP's contention that the court applied the wrong
standard.

¶ 61                             B. The JNOV Was Improperly Granted

¶ 62    Nevertheless, the record does not support the trial court's factual conclusions upon which
it based its grant of the JNOV. Specifically, the record shows that the holdover period ended in
April 2010, when CLLP leased the premises to Julie Ann's. CLLP did not rent to Check 'n Go
until 2012, two years after the holdover period expired. Also, Arendt did not "bump into" the
contractors remodeling the premises for Julie Ann's until June 2010, also after the expiration of
the holdover period. Further, CLLP advertised the premises and entered into the lease with Julie

Ann's to mitigate its damages, which was not inconsistent with its declaration of a holdover. That B&W left its fixtures and signage and kept the only keys to the premises cut against the court's finding that B&W had "no interest or intent" to remain in the premises.

¶ 63    In addition, the court ignored the mass of evidence that B&W controlled the premises through its failure to restore them. From early in 2009 to June 4, 2009, B&W intentionally disregarded CLLP's demands to restore the premises. According to Tom Sr., that delayed CLLP's ability to relet the premises. On June 4, 2009, B&W acquiesced in CLLP's demand that it restore the premises, but it then insisted that it do the work itself. That insistence effectively denied CLLP access to the premises. Rather than follow the original floor plan that was part of the leases, B&W had its own contractor prepare drawings that reflected its preferences, and B&W instructed Arendt to obtain the construction permit without CLLP's knowledge. Whether Habib and Baird promised to do the work and whether those promises, combined with B&W's other acts and omissions, constituted possession were matters for the jury to decide. If reasonable minds may differ as to the inferences and conclusions to be drawn from the facts, it is error to enter a JNOV. *Lee v. Grand Trunk Western R.R. Co.*, 143 Ill. App. 3d 500, 510 (1986).

¶ 64    However, without citing authority, B&W contends that damages under the restoration covenant constituted CLLP's sole remedy. A lease is a type of contract and is governed by the rules of contract law. *Nebel, Inc. v. Mid-City National Bank of Chicago*, 329 Ill. App. 3d 957, 964 (2002). In construing a lease, the court gives effect to the parties' intentions as expressed in the language of the document when read as a whole. *Nebel*, 329 Ill. App. 3d at 964. If that language is unambiguous, the parties' intentions must be ascertained by the language used, not by constructions urged by the parties. *Nebel*, 329 Ill. App. 3d at 964.

¶ 65    The restoration covenant provided that, should the tenant fail to restore the premises, the landlord may do so and the tenant shall reimburse the landlord for the cost thereof, "as additional rent." We assume without deciding—because neither party has briefed this issue—that damages assessed for the failure to restore are set off against any damages assessed under the "Holding Over" provision. The issue is whether, under the leases, holding over can ever include the failure to restore.

¶ 66    The "Holding Over" provision stated that, if the tenant "holds possession" of the premises after the termination of the lease by "lapse of time" or "otherwise," the landlord has the option to declare a holdover tenancy. Here, there was evidence that B&W effectively controlled the premises by (1) promising to do the work to restore them, (2) instructing CLLP not to do the work, (3) hiring a contractor, (4) submitting plans that did not conform to the original floor plan, and (5) instructing Arendt to obtain a building permit and start construction.

¶ 67    The parties have not cited, nor has this court found, a case involving similar facts. However, the trial court instructed the jury that "possession is the fact of having or holding property in one's power or the exercise of dominion over property. Actual possession or occupancy is not necessary to constitute retention of possession. Possession may be inferred from surrounding facts and circumstances." B&W seems to equate the lack of a human presence in the premises after the expiration of the leases with lack of possession. Indeed, B&W stresses that CLLP stipulated that B&W vacated the premises before the leases' expiration and then argues, in rather conclusory fashion, that B&W's failure to restore cannot support a holdover claim. B&W relies on inapposite cases dealing with traditional holdover scenarios. The instant case does not present the traditional scenario in which a tenant physically remains in the premises after the lease's expiration. See *Bransky v. Schmidt Motor Sales, Inc.*, 222 Ill. App. 3d

1056, 1061 (1991) (commercial tenant was a holdover tenant where it continued to conduct business from the subject premises after the expiration of its lease). Indisputably, B&W did not continue to do business out of the premises, and so did not actually hold possession. However, as detailed above, there are sufficient facts in the record for the jury to conclude that B&W nonetheless held possession constructively. At oral argument, B&W acknowledged that the issue of possession was a factual one for the jury to decide, thus conceding the existence of a factual dispute that defeated entry of a JNOV. See *Mikus v. Norfolk & Western Ry. Co.*, 312 Ill. App. 3d 11, 21 (2000) (if the record discloses a substantial factual dispute arising from the evidence, the court has no power to grant a motion for JNOV).

¶ 68        C. The Conditional Ruling that B&W Is Entitled to a New Trial

¶ 69    The court conditionally ruled that B&W is entitled to a new trial on the holdover claim, based on an improper jury instruction. Pursuant to Illinois Supreme Court Rule 366(b)(2)(iv) (eff. Feb. 1, 1994), the reviewing court "may" review any conditional rulings made by the trial court. We elect to review this issue, as we determine that we must reverse the conditional ruling for a new trial and reinstate the jury's verdict.

¶ 70    The court instructed the jury that "a holdover tenant is one who fails to surrender possession to the landlord of the leased premises at the time and in the condition agreed on in the lease." B&W objected to this instruction and offered an alternative instruction without the "in-the-condition-agreed-on" language. The purpose of jury instructions is to convey to the jury the correct principles of law applicable to the evidence presented. *Martoccio v. Western Restaurants, Inc.*, 286 Ill. App. 3d 390, 392 (1997). Each party is entitled to have the jury adequately instructed on his or her theory of the case, as long as the proposed instruction is supported by some evidence in the record. *Martoccio*, 286 Ill. App. 3d at 392. The trial court's decision on

whether to instruct on a particular issue is reviewed for an abuse of discretion. *Martoccio*, 286 Ill. App. 3d at 392.

¶ 71 B&W argues that there was no evidence to support the proposition that it was a holdover tenant. As discussed above, there was ample evidence that B&W exercised control over the premises after the leases expired. B&W also argues that the failure to restore could not constitute a holdover under the leases. We disagree for the reasons stated above. Consequently, we hold that the jury was properly instructed. Accordingly, we reverse the JNOV, reverse the conditional ruling granting a new trial, reinstate the jury's verdict of $113,860, and enter judgment thereon in favor of CLLP and against B&W. As discussed below, we remand for further proceedings on the issue of CLLP's attorney fees. On remand, the court shall also address whether B&W is entitled to a setoff, of $43,927.39 in lost rent that it paid for its failure to restore the premises, against the $113,860 judgment.

¶ 72 D. Whether CLLP Is Entitled to Prejudgment Interest

¶ 73 Under the restoration covenant, "should Tenant fail to [restore the premises], Landlord may do so." The covenant further provided that "Tenant shall reimburse Landlord for the cost thereof as Additional Rent, with interest thereon *** from the date of commencement of said work until paid, which sum shall be due upon presentation of a statement therefor" from the landlord to the tenant. Again, the rate of interest provided in the leases was 10%. CLLP sought interest on the restoration judgment of $111,070.36 from June 1, 2009 (the beginning of the holdover tenancy) to December 6, 2016 (when the court entered judgment). CLLP also sought interest for the same period on the $43,927.39 for lost rent, for a total of $116,442.19. The court denied CLLP's motion on the basis that the amount owed was not liquidated (meaning that it was not certain how much was due) until B&W voluntarily paid the judgment. See *Clark v. Dutton*,

69 Ill. 521, 523 (1873) (a debt is liquidated when it is certain how much is due). However, we need not look beyond the plain language of the leases to decide this issue. The construction and legal effect of a lease are questions of law, which we review *de novo*. *Benford v. Everett Commons, LLC*, 2014 IL App (1st) 131231, ¶ 14.

¶ 74 Both sides agree that the language of the restoration covenant is unambiguous. We also agree. According to the covenant, three things must happen before the tenant's obligation to pay interest is triggered: (1) the tenant must fail to restore the premises, (2) the landlord must do so, and (3) the landlord must present the tenant with a bill for the work performed. "It is an elementary rule of contract law that a condition precedent must be performed or no contractual liability results." *Godare v. Sterling Steel Casting Co.*, 103 Ill. App. 3d 46, 52 (1981). A "condition precedent" is one that must be performed before the other party to a contract is obligated to perform. *Godare*, 103 Ill. App. 3d at 52.

¶ 75 Here, B&W admitted that it failed to restore the premises. However, B&W denies that CLLP performed the work or that it presented B&W with a bill for work that it actually had done. According to CLLP, the estimate that it gave B&W for the work was the same as a bill for having done the work. CLLP also argues that the construction that occurred after B&W left was close to the work in the estimate.

¶ 76 The leases clearly require that the landlord give the tenant a bill for work that has actually been performed, not an estimate for work to be performed in the future. That is the meaning of the words "tenant shall reimburse landlord for the cost thereof." "Reimburse" means to "pay back" an "equivalent for something taken, lost, or expended." Webster's Third New International Dictionary 1914 (1993). "Statement therefor" clearly means an accounting of the money the landlord spent doing the restoration. Further, Tom Sr. admitted that CLLP did not do the work

itself. In answer to the question "You have not restored *** the premises to the way they looked *** in 1988, right?" Tom Sr. said, "That is correct."

¶ 77    CLLP argues that, if for any reason the lease terms do not control, it is entitled to 5% statutory interest. Section 2 of the Illinois Interest Act (Act) (815 ILCS 205/2 (West 2014)) provides that a creditor is allowed interest at the rate of 5% per annum for all monies after they become due on any instrument of writing. See *SNA Nut Co. v. The Haagen-Dazs Co.*, 302 F.3d 725, 734 (7th Cir. 2002). Absent an express agreement of the parties, prejudgment interest is allowed by statute if the amount due is fixed or easily computed. *Bank of Chicago v. Park National Bank*, 266 Ill. App. 3d 890, 900 (1994). First, the terms of the lease control here, as the parties expressly agreed under what circumstances prejudgment interest would be payable. As discussed, CLLP did not meet the terms agreed upon. Second, the amount due was not fixed until the judgment was entered, nor was it easily computed until then. In these bizarre proceedings where B&W filed *four* posttrial motions, the court changed its mind three times about the proper measure of damages. Damages were not fixed, or even capable of computation, until B&W consented to the entry of judgment against it. Accordingly, we determine that the court did not err in denying prejudgment interest.

¶ 78                    E. CLLP's Motion for Sanctions

¶ 79    Next, CLLP argues that the trial court abused its discretion when it denied its motion for sanctions. CLLP maintains that the court's grant of a new trial on damages for B&W's failure to restore the premises was based on the false assertion in B&W's motion for a JNOV that its breach caused no diminution in the value of the premises. Then, CLLP asserts, after two more years of costly litigation, B&W asked the court to reinstate the jury's verdict. Rule 137 allows a court to award sanctions against parties who file documents that have no basis in fact or law.

*Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 72 (2009). To avoid sanctions, parties must present objectively reasonable arguments for their views, regardless of whether they are later found to be correct. *Gambino*, 398 Ill. App. 3d at 73. Whether to impose sanctions is within the trial court's discretion, and its determination will not be disturbed absent an abuse of discretion. *Gambino*, 398 Ill. App. 3d at 73.

¶ 80    CLLP relies on two documents that it argues support the imposition of sanctions. After the trial court granted a new trial on damages, CLLP served B&W with the following interrogatory: "State whether the market value of the Premises was diminished by B&W's failure to restore." B&W objected to the form of the interrogatory and then stated: "B&W will disclose an expert's opinion on the issue of diminished value if and when CLLP discloses an expert's opinion on this issue. Investigation continues." Then, in opposition to the motion for sanctions, B&W responded that its "opinion" was that the failure to restore did not damage CLLP, in part because of the Great Recession and in part because the 1988 configuration was not marketable. According to CLLP, these answers demonstrate that B&W had no factual basis upon which to pursue a new trial. CLLP cites *Baker v. Daniel S. Berger, Ltd.*, 323 Ill. App. 3d 956, 962 (2001), for the proposition that an attorney's honest belief will not suffice where the case is not well grounded in fact or law. B&W responds that it cannot be sanctioned for having obtained a new trial. With respect to its interrogatory answer, B&W asserts that it had no obligation to furnish its expert's opinion at that point, because CLLP had not disclosed its own expert's opinion. B&W further asserts that it sought judgment against it purely as a business decision.

¶ 81    We cannot conclude from B&W's evasive interrogatory answer that it was "unable to identify any facts to support" the claim that there was no diminution in value. B&W's answer was a pro forma nonanswer, a tactic that is all too pervasive in civil trial practice, and nothing

more can be read into it. It is also difficult to conclude that B&W brought the posttrial motion in bad faith given that the court granted it and then chided CLLP for misleading it as to the correct measure of damages. *Baker* is inapplicable. In *Baker*, counsel filed suit based on an unsigned, inoperable document. *Baker*, 323 Ill. App. 3d at 963. Accordingly, we determine that the court did not abuse its discretion in denying the motion for sanctions.

¶ 82                    F. CLLP's Petition for Attorney Fees

¶ 83    Finally, we address CLLP's contention regarding attorney fees. CLLP petitioned the trial court for an award in excess of $500,000 based on paragraph 33 of the leases, which provided that the tenant agreed to pay the landlord's expenses, including attorney fees and costs, incurred in "enforcing any obligations of Tenant" under the leases. Based upon the amount of the recovery, the court awarded $70,000. The court ruled that the fees had to be proportionate to the verdict and that the attorney-fee clause included a prevailing-party provision. CLLP argues that it was entitled to the full amount of its fees, as it proved them to be reasonable.

¶ 84    The general rule is that the unsuccessful party in a lawsuit is not responsible to pay the other party's attorney fees. *Powers v. Rockford Stop-N-Go, Inc.*, 326 Ill. App. 3d 511, 515 (2001). The parties may contractually alter this rule, but fee-shifting provisions in contracts must be strictly construed and enforced at the trial court's discretion. *Powers*, 326 Ill. App. 3d at 515. To determine a reasonable fee, the court considers (1) the skill and standing of the attorney employed, (2) the nature of the cause, (3) the novelty and difficulty of the issues, (4) the amount and importance of the subject matter of the suit, (5) the degree of responsibility of the management of the case, (6) the time and labor required, (7) the usual and customary charges for similar work in the community, and (8) the benefits resulting to the client. *Powers*, 326 Ill. App. 3d at 515. In addition, the court can consider whether there is a reasonable connection between

the fees and the amount involved in the litigation. *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978, 984 (1987). We will not reverse a court's decision regarding attorney fees absent an abuse of discretion. *Powers*, 326 Ill. App. 3d at 515.

¶ 85     CLLP argues that proportionality is not the law in Illinois, citing *J.B. Esker & Sons, Inc. v. Cle-Pa's Partnership*, 325 Ill. App. 3d 276 (2001), a mechanic's lien case.  In that case, the court held that "attorney fees may be reasonable even if the fees are disproportionate to the monetary amount of an award" and noted that the trial court must consider the eight factors listed above in determining reasonableness. *Esker*, 325 Ill. App. 3d at 283. CLLP also relies on *Cannon v. William Chevrolet/Geo, Inc.*, 341 Ill. App. 3d 674, 686 (2003), where the court held in a statutory consumer-protection case that "the award of attorney fees does not depend upon a plaintiff's recovery of substantial monetary damages nor does it need to be proportionate to an award of money damages."

¶ 86     B&W argues that proportionality is a factor that a trial court can consider in determining the reasonableness of attorney fees and that *Esker* and *Cannon* do not hold otherwise. B&W asserts that, because the trial court in our case did not present detailed reasons for its ruling on attorney fees, CLLP "speculates" that the court's "passing remark" that it was a "firm believer" in proportionality indicated that the court did not consider all of the relevant factors. B&W maintains that this court should presume that the trial court considered everything presented to it when making its ruling, citing the nonprecedential case of *Bridgeforth v. Windmon*, 2017 IL App (1st) 161449-U. B&W indicates in a footnote that it cites *Bridgeforth* in accordance with a principle allowing *parties* to cite nonprecedential cases, purportedly announced by this court in *In re Estate of LaPlume*, 2014 IL App (2d) 130945, ¶¶ 23-24. In *LaPlume*, this court relied on the reasoning in a nonprecedential decision because nothing in the language of Illinois Supreme

Court Rule 23(e) prevents a court from doing so. *LaPlume*, 2014 IL App (2d) 130945, ¶¶ 23-24; see *People ex rel. Webb v. Wortham*, 2018 IL App (2d) 170445, ¶ 27 (Illinois Supreme Court Rule 23(e)(1) (eff. Apr. 1, 2018) states that *parties* may *not* cite nonprecedential orders except for limited purposes, but that rule does not bind courts). Consequently, *LaPlume* did not carve an exception to Rule 23(e), and B&W's citation of *Bridgeforth* is improper.

¶ 87    We believe that *Esker* correctly states the law in Illinois and that an award of attorney fees cannot be based *solely* on proportionality, although, as noted, the court can consider proportionality along with the other factors in determining the reasonableness of the fees. Here, it is clear that the trial court did not consider the eight factors in making its fee award but used proportionality as its sole yardstick. For this reason, we vacate the fee award and remand for a new hearing on the appropriate amount of fees to be awarded. We need not decide whether a prevailing-party analysis is appropriate, as we have reinstated the judgment in CLLP's favor on the holdover count and there is no question that CLLP was the prevailing party.

¶ 88                                III. CONCLUSION

¶ 89    For the foregoing reasons, we affirm that part of the judgment of the circuit court of McHenry County denying CLLP prejudgment interest and denying CLLP's motion for sanctions; we reverse that part of the judgment granting B&W's motion for a JNOV and the conditional ruling granting a new trial on the holdover claim; and we vacate that part of the judgment awarding $70,000 in attorney fees and remand for further proceedings to determine a proper award of attorney fees in accordance with this opinion.

¶ 90    Affirmed in part, reversed in part, and vacated in part; cause remanded.